IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

DEAN C. BOYD                                              PLAINTIFF

VS.                        CIVIL CASE NO. 3:24CV496-DPJ-ASH

MISSISSIPPI DEPARTMENT OF CORRECTIONS,           DEFENDANTS
TIMOTHY DONOVAN, FORMER ACTING MEDICAL
DIRECTOR OF MDOC

**TRANSCRIPT OF OMNIBUS HEARING**

BEFORE THE HONORABLE ANDREW S. HARRIS
UNITED STATES MAGISTRATE JUDGE

MAY 21, 2025
JACKSON, MISSISSIPPI

APPEARANCES:

FOR THE PLAINTIFF:
    DEAN C. BOYD, PRO SE
    #167698
    MISSISSIPPI STATE PENITENTIARY
    UNIT 31, D-13
    POST OFFICE BOX 1057
    PARCHMAN, MISSISSIPPI  38738

FOR THE DEFENDANTS:
    LA'BRIA MARSHA BARNES, ESQUIRE
    MISSISSIPPI ATTORNEY GENERAL'S OFFICE
    POST OFFICE BOX 2020
    JACKSON, MISSISSIPPI  39205

REPORTED BY:  TERI B. NORTON, RMR, FCRR, RDR
              Mississippi CSR #1906
_____

501 E. COURT ST., STE. 2.500
JACKSON, MISSISSIPPI  39201
(601) 608-4186

9:03AM 1          **THE COURT:**  All right.  Good morning, Mr. Boyd.

9:03AM 2          **PLAINTIFF BOYD:**  Good morning, Your Honor.

9:03AM 3          **THE COURT:**  Good morning, Ms. Barnes.  How are you?

9:03AM 4     **MS. BARNES:**  Good morning.

9:03AM 5          **THE COURT:**  All right.  We are here today in the

6     matter of Dean C. Boyd versus Mississippi Department of

7     Corrections and Timothy Donovan, former acting MDOC Medical

8     Director.  This is Civil Action 3:24cv496, DPJ-ASH.  We are

9     here today for an omnibus or a *Spears* hearing in your case,

10     Mr. Boyd.

9:04AM 11          **PLAINTIFF BOYD:**  Yes, sir.

9:04AM 12          **THE COURT:**  What we are going to do today is go over

13     your lawsuit, the lawsuit that I've allowed you to file under

14     the imminent danger exception to the Prison Litigation Reform

15     Act.

9:04AM 16          **PLAINTIFF BOYD:**  Yes, sir.

9:04AM 17          **THE COURT:**  You've probably attended one of these

18     before, I imagine.  Have you ever been to a *Spears* hearing?

9:04AM 19          **PLAINTIFF BOYD:**  Yes, sir, I have.

9:04AM 20          **THE COURT:**  Okay.  Let me just go over with you some

21     of the preliminaries, and then we will jump into talking about

22     your case.  Okay?

9:05AM 23          **PLAINTIFF BOYD:**  Yes, sir.

9:05AM 24          **THE COURT:**  All right.  You are proceeding without

25     payment of costs under what is called in forma pauperis or IFP

1    status.  As I mentioned, I allowed you to proceed that way,

2    despite you having three strikes, based on the imminent danger

3    exception.  And because you fall under the Prison Litigation

4    Reform Act, that does require the Court to screen your case

5    under that statute, and by screening it, the statute is a

6    little broad on what the Court is required to do.

9:05AM    7        The statute requires the Court to determine whether or not

8    you have stated a claim on which relief can be granted and

9    whether or not your claim has an arguable basis in fact and an

10    arguable basis in law.

9:05AM    11        Let me just dwell on that for a minute and talk about what

12    that means.  You can have facts that are correct, but you still

13    might not meet the legal standards under 42, United States

14    Code, Section 1983 in order to have a case, or you might not

15    have enough facts but you have got the law on your side.  To

16    get through this screening process, you have got to satisfy

17    both the factual and legal requirements to demonstrate that the

18    case can move past the screening stage.

9:06AM    19        So how do we screen your case, Mr. Boyd?  In order to

20    screen it, first of all, what I do is look at your complaints

21    that you filed in the case.  That being said, sometimes the

22    complaints aren't absolutely clear, so what I do is bring the

23    plaintiff in here, you today, via Zoom, to give you an

24    opportunity to tell me in your own words what your lawsuit is

25    about, what the defendants have done to you in connection with

1  that lawsuit, how you believe they are liable, and what your

2  damages are in the case.  And I will listen to what you say.  I

3  will take that into consideration, along with your written

4  complaint, and then come up with a conclusion about whether or

5  not your case has an arguable basis in fact and an arguable

6  basis in law and whether or not it can proceed to the next

7  stages along the case management spectrum.

9:06AM  8      We will also talk through some of the procedural aspects

9  of your case, things you have probably addressed before but may

10 not recall from your prior *Spears* hearings.  Because I'm

11 required to take what you say into consideration, I am going to

12 swear you in, Mr. Boyd.  Will you please raise your right hand

13 and take the oath.

9:07AM  14      **(OATH ADMINISTERED.)**

9:07AM  15          **THE COURT:**  Thank you, sir.  You can put your hand

16 down.

9:07AM  17      Let me start with the procedural matter.  Let's get that

18 out of the way, Mr. Boyd.  This is a matter of consent.  So you

19 have the option to choose whether or not to have a district

20 judge hear your case or whether or not to have a magistrate

21 judge hear your case.  From your perspective, there's really no

22 difference between the two judges.  The same procedure is going

23 to be used, the rules of evidence will be the same, the right

24 of appeal will be the same.  Everything is the same right down

25 the line, with the only possible difference being that I, as

1    the magistrate judge, can usually get to your case more quickly

2    because I don't handle felony criminal matters like the

3    district judges do, so that could be beneficial for you, but it

4    just depends on what happens in your case.

9:08AM    5        I'm your magistrate judge that's been assigned to your

6    case.  The district judge who is assigned to your case is

7    District Judge Dan Jordan.  I can assure you, Mr. Boyd, it

8    makes no difference to Judge Jordan who the judge is going to

9    be, and likewise, it makes no difference to me.  You are not

10   going to make either of us angry or upset if you choose one or

11   the other, and it won't adversely affect your case one way or

12   the other.  If you choose to keep the case with Judge Jordan,

13   I'm still going to prepare reports and recommendations to Judge

14   Jordan for his review.  So things will still have to go through

15   me.  It will just be a little slower because then he will have

16   to either approve or reject any dispositive things I do.

9:08AM    17       Do you have any questions about the consent process and

18   your consent rights?

9:08AM    19            **PLAINTIFF BOYD:**  No, sir.

9:08AM    20            **THE COURT:**  All right.  What would you like to do?

21   Do you want to have Judge Jordan hear your case or do you want

22   to consent to have me hear the case?

9:08AM    23            **PLAINTIFF BOYD:**  Consent to have you.

9:08AM    24            **THE COURT:**  Okay.  The law allows you to do that, and

25   it requires it to be in writing.  Since you are not here with

1    us in person, what we are going to do is send a consent form to

2    you, assuming that the defendants consent as well.  I'm going

3    to ask Ms. Barnes now, on behalf of the defendants, what is the

4    defendant's position as to the consent issue?

9:09AM    5         **MS. BARNES:**  We consent, Your Honor.

9:09AM    6         **THE COURT:**  All right.  So, Mr. Boyd, what we are

7    going to do is mail a copy of the consent form to you, and I'm

8    going to obtain Ms. Barnes's signature today on behalf of the

9    defendants in the case.  What we will send to you will be the

10    copy that Ms. Barnes has signed on behalf of her clients.  You

11    can review that form.  If you have any questions, you don't

12    have to sign it when we send it to you.  It is up to you to

13    consent.  But to effectuate the consent, you will need to sign

14    that and mail that back to the clerk's office.  Do you have any

15    questions about that?

9:09AM    16         **PLAINTIFF BOYD:**  No, sir.

9:09AM    17         **THE COURT:**  All right.  So let's move on.  You can't

18    see her right now, but Ms. La'Bria Barnes is here today on

19    behalf of the defendants in the case.  Ms. Barnes works as an

20    attorney for the Attorney General's office.  She may have some

21    questions for you as we talk about your case.  Right now I

22    imagine you can only see me on the Zoom.  Is that correct?

9:10AM    23         **PLAINTIFF BOYD:**  Yes, sir.

9:10AM    24         **THE COURT:**  What we are going to try to do, if the

25    technology cooperates, is change the camera over so you can see

1     her, if she has any prolonged period of questioning for you, to

2     make it easier for the two of you to communicate.  But once I

3     finish talking through the case with you, she may have some

4     questions for you as well, and we will get to that stage a

5     little later.  Okay?

9:10AM  6          **PLAINTIFF BOYD:**  Okay.  I have my exhibit list and my

7     witness list.

9:10AM  8          **THE COURT:**  Great.  We will touch on that at the very

9     end.  And because you are not here today, it is unfortunately

10    going to require you to send those to us for us to get

11    possession of them, but we can talk through who your witnesses

12    will be at the end of the hearing.  Okay?

9:10AM 13          **PLAINTIFF BOYD:**  Yes, sir.

9:10AM 14          **THE COURT:**  So let's now shift from the procedural to

15    the substance of the case.  So I've read your complaint, and

16    I've read the other filings you've made in the case, and as you

17    recall, we had a fairly lengthy hearing back in the fall to

18    make the determination about whether you could proceed IFP,

19    under the imminent danger exception, and we talked through a

20    lot of the facts in your case.  We are going to cover those

21    same things again, so today will be a little duplicative of

22    what we covered at the last hearing, but the purpose of today

23    is a little different.  Today's purpose will be to determine

24    whether or not there is an arguable fact or legal basis for the

25    claims I've mentioned.

9:11AM  1      So what I want you to do at this point, I'm going to start

2      by just giving you a chance to talk, and then I will follow up

3      with questions, or I may stop you as we go along with

4      questions.  What I would like you to do is tell me in your own

5      words what your lawsuit is about and how these particular

6      defendants -- you have sued MDOC and Timothy Donovan -- how

7      these particular defendants were involved.  So, in other words,

8      I want you to tell us how they are liable to you, which of your

9      constitutional rights you think have been violated, things like

10     that.  I will tell you you don't have to get down into the

11     weeds of telling me this particular clause of this

12     constitutional amendment.  I want to hear from you, just in

13     your general terms, what rights you think have been violated

14     and why and who did it.

9:12AM 15      I will go into more detail with you as we go along if I

16     need it, so you don't have to get into every minute detail.  I

17     will tell you, Mr. Boyd, I've denied one of your motions to

18     amend, and I know you have another one pending.  And just to

19     recap, I denied the first one because it didn't fall under the

20     imminent danger exception.  So I've let you proceed on this

21     suit that relates to the treatment for your arm and your

22     allegation that MDOC is denying you proper medical care for

23     your arm.

9:12AM 24      So while we are talking about your claims, I don't want to

25     get into issues that aren't in this lawsuit, you know, other

1    claims you might have relating to your heart or your sleep,

2    those kind of things.  Those have been severed off into a

3    different case that I think has now been transferred to the

4    Northern District.  So I may reel you in at some points if you

5    start to get a little far afield of what the claims are about

6    in this case.

9:13AM  7       And I will tell you, too, I don't -- I don't want the

8    focus today to be on the cause of the original injury.  So the

9    physical therapist who injured your arm, I know that sets all

10    of this into motion, but what I've allowed you to proceed on on

11    the imminent danger exception is about after that injury

12    occurs, what happened with your case as far as you trying to

13    get arm surgery, shoulder surgery, and the efforts you made and

14    your claims as relate to that.  That is just to set the context

15    a little bit.

9:13AM  16       So why don't we start.  I guess the injury, as I recall,

17    happened in September of 2022, so that's kind of the starting

18    point for all of this?

9:14AM  19             **PLAINTIFF BOYD:**  Yes, sir.

9:14AM  20             **THE COURT:**  Talk to me about -- you had the injury

21    and you start to seek care.  Maybe walk me through those things

22    with dates, et cetera.

9:14AM  23             **PLAINTIFF BOYD:**  After I got my injury on my right

24    arm, I began to complain to the doctor.  At that time, I was at

25    the prison's hospital, 42, and I been under Dr. Glisson's care.

9:14AM  1          **THE COURT:**  Say that name one more time.  Dr. Liston?

9:14AM  2          **PLAINTIFF BOYD:**  Dr. James Glisson.

9:14AM  3          **THE COURT:**  Glisson.  Okay.  Thank you.

9:14AM  4          **PLAINTIFF BOYD:**  I was under Dr. Glisson's care, and

5      I started complaining to him and to the nurses that I was

6      having more and more pain from my shoulder, you know, after it

7      got injured by the physical therapist.  And he give me shots,

8      the pain shots for it, and then I -- you know, he turned around

9      there and he said, You going to be all right, just don't worry

10     about it.  You know, I turned around there, and he said, We are

11     going to continue with the physical therapy.  And I was, like,

12     The physical therapy is hurting me worse and worse.

9:15AM  13         But to make a long story short, what happened with MDOC, I

14     turned around there -- the first MRI I had of my right shoulder

15     was March of 2023.

9:15AM  16         **THE COURT:**  Well, let me pause you there.  Let me

17     pause you there.  Let's speak about that September 2022 to

18     March 2023 time frame.

9:15AM  19         **PLAINTIFF BOYD:**  Okay.

9:15AM  20         **THE COURT:**  Did anyone in that time frame tell you

21     that you needed surgery?

9:15AM  22         **PLAINTIFF BOYD:**  Yes, sir.  Uh-huh.  Well, the

23     doctors changed right after my injury.  It went from Dr.

24     Glisson to Dr. Antonio Del Castillo.  He became the doctor

25     right after my injury, and he started treating me after that,

1    and he began to give me Tramadol shots.  And I was taking

2    Tramadol shots, and then he was giving me, like -- he started

3    out giving me Tylenol, you know, for it and everything, and I

4    kept telling him, you know, my pain is getting greater and

5    greater as it goes.  I said, I'm hurting real bad.  I need the

6    MRI or something else, to have an x-ray of it.

9:16AM    7         So they sort of -- you know, every time I'd asked about it

8    or made a sick call request, they sort of put it on the back

9    burner.  And then Dr. Antonio Castillo, he told me, he said,

10   you probably got a pulled nerve in it or something like that,

11   he said, because I can sort of tell it's done got stiff.

12   That's what he sort of told me.  And he said, We will try to

13   get an x-ray on it.  But in getting the x-ray, it was put off

14   over and over and over until I finally got him to turn around

15   there and send me out for an x-ray on my right shoulder because

16   it got in a situation where I could barely use it, and that's

17   my only arm that I can use.  My right arm, I can't use it at

18   all, and this is the only limb I have left.  And that sort

19   of -- you know, I had to pull and push with this arm, I had to

20   try to clean myself with this arm and --

9:18AM    21            **THE COURT:**  Let me pause you, Mr. Boyd.  I apologize

22   to interrupt you, but I want to drill down on something you

23   said.  So this doctor, you are saying his name is Antonio

24   Castillo?

9:18AM    25            **PLAINTIFF BOYD:**  Castillo, uh-huh.

9:18AM  1          **THE COURT:**  Your testimony is that at some point he

2      told you you needed -- or he responded to your request for some

3      kind of medical imaging, like an x-ray or an MRI?

9:18AM  4          **PLAINTIFF BOYD:**  Yes, sir.

9:18AM  5          **THE COURT:**  Okay.  I know from your filing you

6      eventually had one in March of 2023.  When did Castillo tell

7      you he was authorizing you to get an MRI?

9:18AM  8          **PLAINTIFF BOYD:**  About maybe -- it was probably about

9      six months before I got it.

9:19AM 10          **THE COURT:**  Okay.  So the injury was in September of

11      2022, and the MRI was in March of 2023.  That's about six

12      months.

9:19AM 13          **PLAINTIFF BOYD:**  Yes, about six months, uh-huh.

9:19AM 14          **THE COURT:**  So how long after the injury did Castillo

15      tell you he was ordering an MRI?

9:19AM 16          **PLAINTIFF BOYD:**  My injury was back further than

17      2022.  September of 2022 is -- that's the time they turned

18      around there -- I think I stopped going -- I had to stop

19      physical therapy because I couldn't stand the pain no more.

20      But the actual -- the actual accident -- the injury happened in

21      2020.

9:19AM 22          **THE COURT:**  Okay.

9:19AM 23          **PLAINTIFF BOYD:**  September '22 is when I had put it

24      into the Fifth Circuit Court, and they turned around there and

25      they -- the District Court turned around there and had

1    dismissed it -- was going to dismiss it and said I didn't -- I

2    couldn't go IFP, in forma pauperis.

9:20AM    3              **THE COURT:**  Okay.

9:20AM    4              **PLAINTIFF BOYD:**  So --

9:20AM    5              **THE COURT:**  So let me just step back and let's

6    clarify then.  So the injury was in 2020.  Right?

9:20AM    7              **PLAINTIFF BOYD:**  Right.

9:20AM    8              **THE COURT:**  Okay.  And your testimony is that around

9    September of 2022 is when Castillo tells you he's ordering an

10    MRI?

9:20AM    11              **PLAINTIFF BOYD:**  That's right.

9:20AM    12              **THE COURT:**  And then you had the MRI about six months

13    later in March of 2023?

9:20AM    14              **PLAINTIFF BOYD:**  Well, I went to Dr. Speca before

15    I -- after I took and had the MRI in March of 2023, I was sent

16    to an orthopaedic surgeon in Greenville, and his name was

17    Dr. Speca, and he turned around there and did his own x-rays of

18    it.  He went over the MRI, and he took it -- he examined me

19    himself by moving my arm and different stuff, and he told me,

20    he said that my arm was in bad shape, that it had ripped and

21    torn tendons.  He turned around there and he said that it had

22    inflammation and -- some infection and some inflammation in it

23    that was very serious, that I could lose my arm over it.  And

24    that's my only arm that I got.  So he also told me, he said

25    that it could get to the point where that inflammation, as

1    close it is to your heart, it could go over your body and kill

2    you, he said, let alone losing your arm.

9:21AM    3        And I said, Well, will you do the surgery to get it fixed?

4    He told me that one of my main problems was that I was taking

5    that Tramadol injection in that shoulder, and it had had a lot

6    of black stuff -- he showed me inside of it, or whatever, and

7    he said, you know -- he showed me and he said, Do you see how

8    bad it looks in the inside of your arm?  And he was showing me

9    the x-rays of it, and he went over the MRI, and he told me, he

10   said, most of the time when someone's tendon is usually tore,

11   and it is tore from the side across and not ripped like yours

12   is -- he said, Yours is ripped like a rope that's got a lot of

13   threads in it.  And he said, it is ripped apart.  And he said,

14   Only some of your tendons are still there to hold your arm

15   together.  He said, If the nerve from your neck to your right

16   shoulder is -- from your arm dropping -- he said my shoulder

17   had dropped, and he said if that nerve comes a loose, I

18   couldn't even have surgery to even repair it.  And he told me

19   how bad it was, and me steady continuously reinjuring it trying

20   to use only that arm, you know.

9:23AM   21        After he told me, he said, It's too big a surgery for me.

22   He said, I don't want to do the surgery.  He said, What I will

23   do is I'll recommend you to the University in Jackson to an

24   orthopaedic surgeon there.

9:23AM   25        So that was about, I would say, just right after the MRI.

1    And the University, in a couple of months later, they turned

2    around there and they declined to do the surgery for me, for

3    what reason -- they said the reason was, through me getting my

4    own research, they said that MDOC hadn't paid their bills with

5    them or something like that.

9:24AM    6         THE COURT:  Let me pause you, Mr. Boyd.  So you go

7    see -- you have your MRI in March of 2023, and then you go see

8    Speca, Dr. Speca, in May of 2023, and he tells you the things

9    you just said about the condition of your arm, and he refers

10   you to UMMC.

9:24AM    11        And then you say UMMC wouldn't -- that UMMC, excuse me,

12   declined you as a patient, and your testimony just now was that

13   you believe that was based on MDOC refusing to pay UMMC or

14   having outstanding bills with UMMC.  Tell me what evidence you

15   have to support that contention about UMMC and MDOC's payment.

9:25AM    16        PLAINTIFF BOYD:  Well, that situation right there

17   was -- well, I have relatives that works there, and I don't

18   have any written out proof or anything like that, but I have

19   relatives that work at UMMC, because I live in Jackson and been

20   around there.  They said that they would have to have a check

21   when they bring me in order to turn around there and do the

22   surgery.  They would have to have some sort of a payment plan

23   before they do my surgery.  That's what I got from my family,

24   you know, my relatives that's employed there.

9:25AM    25        THE COURT:  All right.  Dr. Speca, the things you say

 1   that he told you, is any of that also contained in a written

 2   medical record, to your knowledge?

9:26AM  3           **PLAINTIFF BOYD:**  Yes, sir.  Well, I've got a -- well,

 4   everything that I -- with Dr. Speca -- let me make sure.  Yeah,

 5   I got the -- I have the paperwork to show that my exhibits of

 6   what he -- of him referring me to UMMC, UMMC -- to the

 7   University in Jackson.  I have the -- what he faxed them, what

 8   he wrote them, told me about him referring me to UMMC and what

 9   he spoke of in that referral.

9:26AM 10           **THE COURT:**  Whenever UMMC declined you as a patient,

11   were you notified of that in anything in writing?

9:27AM 12           **PLAINTIFF BOYD:**  Yes, sir.  I have that.

9:27AM 13           **THE COURT:**  Okay.  Was it a document from UMMC

14   stating a reason for declining you?

9:27AM 15           **PLAINTIFF BOYD:**  Yes, sir.  In there, I have that as

16   an exhibit in the paperwork that you should have gotten.  And

17   in that MDOC -- I mean, UMMC -- UMMC said that they felt that

18   my case was not unique.  They said that they feel that I did

19   not meet the criteria for them to perform the surgery, that I

20   should get someone in the Delta that I'm closest to to perform

21   the surgery.

9:27AM 22       So since they turned around and declined to do the

23   surgery, that left me hanging there where they said that,

24   well -- I kept telling them the pain I was in, and they was

25   wanting to continue to give me the injection shots, and I'm

1  talking about how the pain becoming excruciating because I got

2  pinched nerves and different things in that right arm.  And you

3  know, I was telling Dr. Castillo, you know, that I keep

4  injuring it.  And he said, yes, you keep injuring it.  He said,

5  You are not going to be able to use it much.  Try not to use

6  it.  We are going to have to find you some doctor or other.

9:28AM   7          **THE COURT:**  Let me pause you for one second,

8  Mr. Boyd.  So about when in time -- about what date did UMMC

9  decline you, to your knowledge?

9:28AM   10          **PLAINTIFF BOYD:**  That had to be between -- I would

11  say right after I saw Dr. Speca.  I'll say it was probably in

12  August or September that they got back with -- that they wrote

13  that letter back where they declined me, and I got that letter

14  back, and Dr. Castillo, he showed it to me, and I took it and

15  got a copy of it, and I put it as exhibits in the exhibits I

16  sent to you.

9:29AM   17      And like I said, they said that they felt that I didn't

18  meet the criteria.  They said that they didn't feel that --

19  that they -- in other words, I didn't meet their criteria.

9:29AM   20          **THE COURT:**  Okay.

9:29AM   21          **PLAINTIFF BOYD:**  The only the reason I seen that they

22  could use was what my family got when they went back and asked

23  the human resource lady.  She said that they hadn't paid their

24  bills, so they are not going to do the surgery.  That's why

25  they declined you.  But I have no proof in writing of that.

1    That's what I have learned from my relatives that are employed

2    there.

9:30AM   3         THE COURT:  Okay.  So sometime in the summer of 2023,

4    UMMC declined you.  What happens next with your arm?  I think

5    you were testifying just now you kept getting some shots, you

6    were still in pain.  Tell me about the treatment after UMMC

7    declined you and whether you have seen any more doctors.

9:30AM   8         PLAINTIFF BOYD:  After UMMC declined me, turn around

9    there and I continued injuring that arm because it was already

10   torn and ripped and -- I mean, the tendons severed, and they

11   told me that the rotator was enlarged.  They told me that it

12   did have pinched nerves and flattened cartilages.

9:31AM   13        And I have the MRIs in writing on all of that, exactly

14   what's wrong with my arm.  I got the MRI from March the 20th,

15   2023.  And after I seen Speca, after I was declined by the

16   University, I kept injuring my arm because I have no other way

17   to pull myself -- to keep from getting sores on my buttocks, I

18   have to move myself in different ways, and I have to use that

19   one arm to do it all.  And Dr. Castillo was, like, you know, I

20   don't see how we can stop you from injuring it because that's

21   the only arm you've got.

9:31AM   22        And I have helpers that help me, but still, there are

23   times when I am by myself and I have to turn myself and

24   different things.  And he said, you know, I'm trying my best to

25   get you another doctor.  So that went on from all the way until

1    the next year, and that went on for -- just taking -- he put me

2    on a narcotic pain medication, but the nerve impingement got so

3    great until that wasn't even helping me.  Like I said, I

4    continued to reinjure it all into the next year in June -- I'm

5    going to say April of 2024, they finally decided they would do

6    something for me after I had suffered another whole year.  This

7    is going on, like, three years of complete and excruciating

8    pain that I've been going through.  And they just, like --

9    other than Dr. Castillo saying, Look, I'm doing all I can do.

10   They ain't found -- they said they are going to find you a

11   doctor.

9:33AM  12   So that was a whole other year I suffered.  I suffered

13   with excruciating pain, steadily reinjuring my arm.  Turned

14   around and the doctor telling me he was doing all he could do,

15   but a lot of it was out of his hands at that time.  And about

16   April of 2024, they sent me to Oxford, Mississippi, to an

17   orthopaedic surgeon named Terry.  I don't know his last name,

18   but his first name was Terry.  It's in my medical records.

9:33AM  19   Anyway, I went to him, and he turned around there and he

20   said -- he examined me.  He took x-rays also, just as Dr. Speca

21   did.  He turned around there and said, you know, Your arm is in

22   bad shape.  He said, I want my own MRI of it.  He said, I don't

23   take an MRI unless -- it's got to be not over one year old.  He

24   said, I want you to do a nerve conduction also on that arm to

25   make sure that your main nerve from your neck that connects to

1  your right shoulder is not already tore loose because your arm

2  has already dropped, and it could be torn that nerve aloose.

3  If that nerve is torn loose, there's no need of me doing the

4  surgery because it wouldn't do you no good.

9:34AM  5      So after that happened with me, he wanted the nerve

6  conduction, he wanted me to do another MRI, and he wanted me

7  to -- one other thing that he wanted me to do.  I can't think

8  of it just this moment.  But anyway, so a couple -- I would say

9  it was about June the 6th -- yeah, June the 6th, I would say

10  somewhere in there, or the last of May, I went into Bolivar

11  Medical Center to have an MRI done on my arm a second time.

12  And I had that MRI done, and after they did the MRI on my arm

13  in June or late May, and it showed that my arm had -- was

14  basically about the same but had worsened a little bit, but it

15  had the same injury as before, you know, and it was in the same

16  shape with the torn tendons, the impinged nerves.  And my

17  whole -- my arm had -- my hand and my arm is numb, you know.

9:36AM  18      So I was waiting on the nerve conduction.  And they were

19  sort of like when I took the MRI, they just stopped doing

20  anything for me.  They just started giving me pain medication

21  at the prison, you know.  And I'm steady telling Dr. Tony on

22  sick call during the week that my arm had become excruciating,

23  and even with the narcotic pain medicine I'm taking, with the

24  injection of shots, I'm still in excruciating nerve pain.  He

25  was, like, I understand, but you keep injuring it because you

1    keep using it.  And that's one of the things.  There's no way

2    for me not to use it.  He was, like, Well, I'm trying

3    everything I can do to get your nerve conduction done so you

4    can go back to see him.

9:37AM  5        So it went on all the way up to about February of 2025.  I

6    suffered all the way another year, all the way up until

7    February that they took me -- they finally took me to a nerve

8    conduction.  And when I went to the nerve conduction, it had

9    been over a year for Dr. Terry to have the MRI.  The MRI, he

10   did it.  He would not accept the MRI unless I did another one.

11   I went and got the nerve conduction done.  They told me, oh,

12   you have got several pinched nerves.  That's why your whole arm

13   is numb, that's why you have no sensation in your right arm,

14   and if you don't get it fixed, that nerve is going to tear

15   loose from your arm being down, dropped, your arm is dropped,

16   and you are going to lose your arm or your life from the

17   inflammation and infection in it.

9:38AM  18        So I went back to Dr. Terry, but Dr. Terry would not

19   accept me back unless I had another MRI done of my shoulder a

20   third time.

9:38AM  21             **THE COURT:**  Hold on, Mr. Boyd.  Let me pause you for

22   a second.  So I want to recap with you to make sure I'm

23   following what you are saying.  So you go get a second MRI

24   around the end of May or early June 2024 because Dr. Terry in

25   Oxford says your previous MRI is too old.  So you go get an

1    MRI, and he also says you need a nerve conduction study.  And

2    your testimony is that that didn't happen until February of

3    2025?

9:39AM    4          **PLAINTIFF BOYD:**  Exactly.  I got both x-rays -- I got

5    both MRIs as exhibits in my --

9:39AM    6          **THE COURT:**  Okay.  Let me ask you questions.  I want

7    to ask some questions right now just to make sure I'm

8    understanding your claim.

9:39AM    9        So you got the nerve conduction study in February of 2025.

10    At this point, your last MRI is not quite a year old, but it's

11    probably 8 months old at that point.  Have you been back to see

12    Dr. Terry since you had your nerve conduction study?

9:40AM    13          **PLAINTIFF BOYD:**  He said that he didn't want to see

14    me back if I didn't have another MRI done that was new.  He

15    wouldn't accept the May -- he wouldn't accept the June of 2024

16    MRI.

9:40AM    17          **THE COURT:**  Okay.  You say he wouldn't see you back

18    until you got another MRI, I guess, in 2025.  How do you know

19    that's what he said?

9:40AM    20          **PLAINTIFF BOYD:**  Sir?

9:40AM    21          **THE COURT:**  How do you know that Dr. Terry said he

22    wouldn't see you back unless you got another MRI in 2025?

9:40AM    23          **PLAINTIFF BOYD:**  That was told to me by Dr. Castillo.

24    I said, Why haven't you gotten me another MRI so I can go back

25    to Dr. Terry to do my surgery?  I simply told him what the

1    conduction doctor there told me about the pinched nerve and

2    that I needed to go ahead and have the surgery.  But

3    Dr. Castillo said that Dr. Terry wants you to have another MRI

4    done before you come back to see him because he don't want --

5    he wants a new MRI.

9:41AM  6        And from there, I just been dealing with excruciating

7    pain.  I asked Dr. Castillo, I said, Well, what are they doing

8    to try to get me an MRI?  He said, You know, that's out of my

9    hands.  I can't do anything but wait.  And I was, like, I'm in

10   a lot of pain and I really need this done.  It was just like

11   I've just been hanging since then.

9:41AM  12          THE COURT:  Mr. Boyd, when did Dr. Castillo tell

13   you -- so you had your nerve conduction study, and you are

14   telling me Dr. Castillo told you, before you could go back to

15   Dr. Terry, you needed to have another MRI.  Around when did

16   Dr. Castillo tell you that that was Dr. Terry's position?

9:42AM  17          PLAINTIFF BOYD:  Right after the nerve conduction.

9:42AM  18          THE COURT:  Okay.  Do you have -- what is your

19   allegation about why you did not have a nerve conduction study

20   until February of 2025?

9:42AM  21          PLAINTIFF BOYD:  (Unintelligible.)  One thing is this

22   right here.

9:42AM  23          THE COURT:  Start over, if you don't mind, Mr. Boyd.

24   Our court reporter had some difficulty hearing what you said.

9:42AM  25          PLAINTIFF BOYD:  Okay.  One of the reasons that was,

1    they do not have a handicap van here.  Like I said, I'm a

2    quadriplegic with only just the limited use of this right arm,

3    and I have to be taken out in a handicap van while I'm in the

4    chair.  That's the way that it is put in the paper, that I be

5    transported by a handicap van, and they don't have that here.

6    Both of their handicap vans has been tore up for -- I'm talking

7    about for almost about two years it's been where I could barely

8    get out to go to my scheduled appointments.  And that's one of

9    the reasons.

9:43AM  10    That's the reason now that I'm not going to a lot of my

11    appointments.  They are being cancelled and upsetting the

12    doctors, with me not coming back in a length of time.  Also,

13    because Dr. Castillo said -- I asked him, I said, Why, why are

14    they not going on and getting me the nerve conduction done?  He

15    said, It is MDOC.  He said, It's out of my hands.  I can do

16    nothing but just prescribe you pain medication until they get

17    you -- until they take you out to -- to get the nerve

18    conduction done.

9:44AM  19    And like I say, that was a whole other year I had to

20    suffer with excruciating pain, and then this nerve conduction,

21    it sort of set off my arm -- the way that it was done, it sort

22    of made my arm worse than it was.  But, you know, that was the

23    procedure that he wanted done to make sure that the nerve was

24    hooked up and everything else.  And it was a very painful

25    experience.  But like I say, from the nerve conduction until

1   now, it's just me just waiting, not knowing when I might even

2   get a surgery because of the deliberate indifference of not

3   having a handicap van, the deliberate indifference of MDOC just

4   not getting this done.  I've been dealing with this for 3 or 4

5   years.  It has worsened so bad now until I'm almost going to

6   get to a point to where -- if I lose this arm here, I'm just

7   like a vegetable almost.  I can't do nothing for myself.  This

8   is all I got left is my right arm.  It's in so bad a shape now

9   that I can barely even use it to pull myself from one side of

10  the bed to the other side of the bed without it being so

11  excruciating.

9:45AM  12      And Dr. Castillo, like I say, it wasn't in his hands to

13  make the call on it.  That would be the medical director of

14  MDOC that makes that call.

9:46AM  15          **THE COURT:**  Okay.  Let me -- let me ask a question

16  for just a minute, Mr. Boyd.  I'm confused about something, and

17  I want you to clear up my confusion for me.  I understand your

18  testimony is the delay of getting you to the nerve conduction

19  study or getting you to other appointments is attributable, at

20  least in part, to there not being a vehicle that can transport

21  you.  If that's the case, how did you get to the nerve

22  conduction study at all?

9:46AM  23          **PLAINTIFF BOYD:**  They have had -- they have a bus, a

24  bus that they took me in.  It was for handicap -- they took me,

25  loaded me on it and took me to the conduction.  But the thing

1    about that bus is that it stays out of order.  It's not

2    accessible.  It's either going another way -- it's working -- I

3    will say it like this right here.  This handicap bus is turned

4    around there and it's probably about 3,000 inmates at the

5    Mississippi State Penitentiary, and that bus has to take every

6    handicap person wherever they need to go.

9:47AM   7         And I always miss my appointments or whatever because it

8    is in use somewhere else or it is out of working condition,

9    just as now.  I've been trying to get to the doctor since

10   January of 2025, and I have turned around there and not been

11   able to be taken out of there, me and many other guys that are

12   handicapped or paraplegic.

9:47AM  13              THE COURT:  Okay.  So you mentioned a minute ago the

14   medical director.  Is that Dr. Donovan?

9:48AM  15              PLAINTIFF BOYD:  At the time that I was -- at the

16   time of me going out and having my MRI done, and when the

17   doctor requested the nerve conduction and everything, Dr. -- he

18   was the medical director then.

9:48AM  19              THE COURT:  So I've heard your claims.  I understand

20   factually your claims.  Let's just zoom in a little bit.  You

21   sued MDOC and you've sued Dr. Donovan.  So explain to me -- you

22   don't have to restate everything you've said, Mr. Boyd, but as

23   it relates specifically to Donovan, why is it that you are

24   suing Donovan?  Why do you claim he is liable to you?

9:49AM  25              PLAINTIFF BOYD:  I really had Donovan for MDOC

1    because I steady wrote Dr. Donovan.  For almost two years

2    straight, I wrote him every week asking him to please get this

3    surgery done, I don't want to lose my arm, I don't want to lose

4    my life, that MDOC's deliberate indifference had become cruel

5    and unusual punishment for me to continue to deal with that

6    excruciating pain day and night.  And I told him I got in a

7    situation where I couldn't even go to sleep at night for this

8    pain.  And I steady continued to write him and write him back

9    and forth, and he wrote me back maybe one time out of all of

10   those times.  And he said, You can't make UMMC do your surgery.

11   I understood that I couldn't make them do my surgery, but, you

12   know, I continued to ask him.

13       And he was the -- Dr. Donovan was the acting medical

14   director at that time.  And, you know, he sort of -- like I

15   said, I wrote him two years, and he wrote me back one time out

16   of those two years, and I wrote him every week.  So he had

17   complete knowledge of what I was going through.  I even sent

18   him the exhibits to show him that UMMC had turned around there

19   and declined to do my surgery.  And I kept, you know, sending

20   different exhibits to him and showing him, but he never would

21   respond back on none of them but one time.

22       **THE COURT:**  How do you contend Dr. Donovan violated

23   your constitutional rights?

24       **PLAINTIFF BOYD:**  Well, he violated my Eighth

25   Amendment right because of deliberate indifference, because he

9:50AM  13

9:50AM  22

9:50AM  24

1    turned around there and he -- he's the one that has the say-so.

2    He's the chief medical director.  He's the one -- he could have

3    just -- he could have granted it at any time for me to have

4    this surgery, for me to have the nerve conduction, for me to

5    have the MRI, but he didn't do that.  You know, and the reason

6    I know he didn't do it, because Dr. Castillo said, Hey, it is

7    up to the medical director.  I can't do nothing over the

8    medical director.

9:51AM    9    So it was in his -- the ball was in his court.  He was the

10    chief medical director, and he had complete -- not only

11    knowledge of my medical -- he had my medical records as

12    evidence for him to know that I need the surgery.  He had

13    Dr. Speca's, what he said.  He had the MRIs.  He had me writing

14    letters every week for two years.  So he had complete knowledge

15    of what was going on with me, but he sort of just -- he ignored

16    it.  He ignored my -- he ignored my cry out to him for help

17    with this shoulder, to get my shoulder done so that I could get

18    it well and not lose my arm or my life with the inflammation

19    and infection that was around the bone, that is there now.

9:52AM    20    So that's the deliberate indifference because that has

21    caused me to suffer with cruel and unusual punishment because

22    I'm to the point now where it's been three straight years of

23    excruciating pain and almost not to have another limb on my

24    body working other than this right arm.

9:53AM    25    **THE COURT:**  All right.  You've also sued MDOC, the

1      Mississippi Department of Corrections, as a defendant.  Tell me

2      why you have named them in the lawsuit and what MDOC has done

3      to violate your constitutional rights.

9:53AM    4      **PLAINTIFF BOYD:**  MDOC, the way they violated my

5      Eighth Amendment right to deliberate indifference and to cruel

6      and unusual punishment is because it's every week that I make

7      out a sick call to them, and I turn around there and I have

8      begged them for the last three years every week, not missing a

9      week, and it will show in my medical records that every week I

10      fill out a medical service request form telling them about the

11      excruciating pain in my right shoulder.

9:54AM    12      And between one year to the next year, I have begged them

13      every week for 365 days a year to get me medical help for that.

14      And most of the time I turn around there and I say -- I would

15      ask Dr. Castillo, when he come in, I say, Why they not letting

16      me get this surgery done?  Why don't they do what the doctor

17      has already ordered?  It's the doctor's request that has to be

18      fulfilled before I come back.  Like Dr. Terry, he said, Don't

19      come back until you have had that MRI done that's less than one

20      year, he said, and that you have the nerve conduction done.

21      I'm not going to accept it.  So I come back, I sign the release

22      papers of what he said to MDOC so that they could do this.  But

23      they did not do it.

9:55AM    24      And most of the time, I say, Dr. Tony, what is going on

25      now?  And he said, The medical director has not approved it.

1    And then yes, they approved it, but they don't have

2    transportation to take you to your appointments.

9:55AM   3              THE COURT:  Who told you that statement you just made

4    about the medical director had not approved it?  The statement

5    you just made about the medical director had not approved it,

6    referring to --

9:55AM   7              PLAINTIFF BOYD:  That was Dr. Castillo.

9:55AM   8              THE COURT:  How do you spell Dr. Castillo's name?

9:55AM   9              PLAINTIFF BOYD:  C-A-S-T-I-L-L-O.

9:55AM   10             THE COURT:  All right.  You've mentioned Dr. Castillo

11    a bunch.  Are you suing Dr. Castillo, or is he just a witness

12    for some of the things that happened?

9:55AM   13             PLAINTIFF BOYD:  No, sir, not at all.

9:55AM   14             THE COURT:  You mean, no, you are not suing him?

9:55AM   15             PLAINTIFF BOYD:  No.  He done all he can for me.

16    Like he said, once he do all he could do, it is out of his

17    hands.  It was in the medical director's hands.  It was people

18    higher on up the ladder in MDOC than him in making the

19    decisions to me getting the surgery, getting the nerve

20    conduction, getting the MRIs, and MDOC has deliberately,

21    knowingly just turned around there and ignored my sick call

22    for -- they turn around there and give me pain medication, but

23    as far as getting me to the doctor's orders, they failed to do

24    the doctor's orders when they knew what the doctor's orders

25    were.  They knew the condition, that he wouldn't take an MRI

```
        1    after one year.  They knew that I needed a nerve conduction

        2    done.  And since all of that took so long to get done, now they

        3    are up to a point where now Dr. Castillo said, We've got to get

        4    you another doctor.

9:57AM  5         Now I'm just hanging out there just dealing with

        6    excruciating nerve pain and reinjuring this right arm day after

        7    day, and sitting here even now in pain, hurting, with this

        8    right shoulder, my only limb of my body, and turn around there.

        9    They have no proof what doctor they going to get, or they

       10    haven't even made a choice to get me a doctor to do this

       11    surgery.  I'm still as far off as I was from getting this

       12    surgery as I was 3 years ago.

9:57AM 13              THE COURT:  Mr. Boyd, do you have any -- do you have

       14    any MRIs or appointments currently scheduled concerning your

       15    arm?

9:58AM 16              PLAINTIFF BOYD:  I've got both MRIs as exhibits.  I

       17    have them.

9:58AM 18              THE COURT:  No, let me clarify.  I think you

       19    misunderstood me.  Looking forward into the future, do you have

       20    any medical appointments that are currently scheduled

       21    concerning treatment for your arm, including concerning another

       22    MRI, things that are scheduled right now?

9:58AM 23              PLAINTIFF BOYD:  Nothing is scheduled right now.  I'm

       24    just hurting.  Like I talked to the doctor on yesterday, which

       25    was Tuesday.  I talked to Dr. Castillo, and he came and told
```

1   me, he said, Look, we don't have you a surgeon to do it.  We've

2   got to try to find somebody to do it.  That's the same thing

3   I've been hearing for three years.  And I understand that it's

4   not Dr. Castillo's -- it's not in his hands to do it.  He

5   recommended me for an orthopaedic surgeon to do this surgery,

6   but they won't answer it.

9:59AM   7        Like I say, they don't even have transportation to take

8   me.  They would have to -- I just had -- this is in a different

9   sort of situation, but I almost had a heart attack in January.

9:59AM   10       **THE COURT:**  You are getting into a different issue,

11   Mr. Boyd.  Mr. Boyd, I think we are going back over the same

12   stuff, so I want to shift to the next phase to talk to you

13   about what relief you are seeking.  So, in your lawsuit, what

14   relief are you seeking from the defendants you have sued, MDOC,

15   and Dr. Donovan?

9:59AM   16       **PLAINTIFF BOYD:**  The main thing is to get my shoulder

17   surgery done.

9:59AM   18       **THE COURT:**  All right.  So that's the main thing.

19   What else are you seeking?

9:59AM   20       **PLAINTIFF BOYD:**  And I seek the monetary damages for

21   my pain and suffering.

9:59AM   22       **THE COURT:**  How much in terms of money are you asking

23   for in the lawsuit?

10:00AM   24       **PLAINTIFF BOYD:**  Well, on the paper, I put up there a

25   real high number, which is I think $20 million, which I know

1    that's not possible, but, you know, I'm willing to work with

2    them any way they work with me to get that done and pay me some

3    form of pain and suffering for almost five years of just cruel

4    and unusual punishment because of their deliberate

5    indifference.

10:00AM    6       **THE COURT:**  All right.  Bear with me one second,

7    Mr. Boyd.  I'm going to look over my notes here.

10:00AM    8      As to Dr. Donovan, you may have put this in your papers,

9    Mr. Boyd, but the point of having this hearing is to get

10    clarification.  Are you suing him in his official capacity or

11    his individual capacity or both?

10:01AM    12       **PLAINTIFF BOYD:**  Both.

10:01AM    13       **THE COURT:**  At this point, I'm going to let Ms.

14    Barnes, to the extent she has any questions, ask you some

15    questions, Mr. Boyd.  And if she does have some questions, I'm

16    going to get the camera hopefully pointing at her so it is

17    easier for y'all to communicate.  Ms. Barnes, do you have any

18    questions or anything you would like to ask in follow-up to

19    Mr. Boyd?

10:01AM    20       **MS. BARNES:**  Yes, Your Honor, I have a few.

10:01AM    21       **THE COURT:**  You may proceed.  And Mr. Boyd, just a

22    reminder, the court reporter is typing down a written

23    transcript, and if you and Ms. Barnes talk at the same time,

24    it's difficult for Ms. Teri to write down what y'all are

25    saying.  So please make sure you let Ms. Barnes finish her

1      question before you start answering.

10:01AM   2              **PLAINTIFF BOYD:**  Yes, sir.

10:01AM   3              **THE COURT:**  Thank you.

10:01AM   4              **MS. BARNES:**  Good morning, Mr. Boyd.  Can you hear me

5      okay?

10:02AM   6              **PLAINTIFF BOYD:**  Yes, ma'am, I can.

10:02AM   7              **MS. BARNES:**  All right.  I am here on behalf of MDOC,

8      as well as Dr. Donovan.  And I just have a few questions for

9      you regarding your testimony earlier.  Okay?

10:02AM  10          So my first question is, are you currently taking any

11     medication for your pain?

10:02AM  12              **PLAINTIFF BOYD:**  Yes, I'm taking medication for my

13     pain.

10:02AM  14              **MS. BARNES:**  Okay.  What medication are you taking at

15     the moment?

10:02AM  16              **PLAINTIFF BOYD:**  Tramadol, a very low grade narcotic

17     that has -- I've taken it so long until it does not have much

18     of alleviate -- you know, it does not relieve my pain as much

19     because I'm so used to taking it.

10:02AM  20              **MS. BARNES:**  Okay.  Thank you.  So you've been taking

21     this medication since the injury occurred; is that correct?

10:03AM  22              **PLAINTIFF BOYD:**  No, not since the injury occurred.

23     I just started taking this medication probably 2023, after my

24     first MRI.

10:03AM  25              **MS. BARNES:**  Okay.  You said the injury occurred in

1 2020; is that correct?

10:03AM 2        **PLAINTIFF BOYD:**  That's right.  And then I put it in

3 the Court, and the -- in September of 2022, the Fifth Circuit

4 turned around there and granted -- reversed and rendered it

5 back to the Court, back to the District Court.  And when they

6 rendered it back to the District Court --

10:03AM 7        **THE COURT:**  Mr. Boyd, I'm going to stop you.  That's

8 a Northern District case.  Let's focus -- I think you answered

9 Ms. Barnes' question.  Let's let her go to the next one.  Okay?

10:04AM 10        **PLAINTIFF BOYD:**  Okay.

10:04AM 11        **MS. BARNES:**  So between 2020 and 2023, what

12 medications did you take?

10:04AM 13        **PLAINTIFF BOYD:**  Say those year numbers again.

10:04AM 14        **MS. BARNES:**  Between 2020, when the injury first

15 occurred, and 2023, when you started to take Tramadol, what

16 medications were you taking?

10:04AM 17        **PLAINTIFF BOYD:**  I was taking Tylenol.  I took

18 some -- I wasn't taking -- I was taking Gabapentin, but

19 Gabapentin, it was for that -- not that purpose.  It was for

20 other -- another reason, another illness that I was taking it

21 for.  I was taking it for my neck.  But I'm sure, you know,

22 turned around there and was helping my shoulder some too.

10:05AM 23        **MS. BARNES:**  And just to clarify, I know we are

24 speaking about the possibility of surgery on your shoulder.

25 Have you had surgery at all on that arm before?

10:05AM  1          **PLAINTIFF BOYD:**  Never.

10:05AM  2          **MS. BARNES:**  And you may have spoken to this earlier,

3     but this is just for clarification.  What medical

4     professionals, if any, told you that you needed surgery on your

5     shoulder?

10:05AM  6          **PLAINTIFF BOYD:**  Dr. Speca referred me to the

7     University.  He was the orthopaedic surgeon.  He told me

8     direct.  Dr. Castillo that's here, that's the medical director

9     at Mississippi State Penitentiary right now, that I see every

10    week, he turns around there and he's -- these doctors -- I have

11    the MRIs now that show that I need right shoulder surgery this

12    moment.

10:06AM 13          **MS. BARNES:**  And let me ask you this about Dr. Speca.

14    Where is he employed?

10:06AM 15          **PLAINTIFF BOYD:**  He's employed in the Delta.

10:06AM 16          **MS. BARNES:**  You also spoke about an infection in

17    your right shoulder.  Which medical professional gave you this

18    diagnosis?

10:06AM 19          **PLAINTIFF BOYD:**  Dr. Speca took and told me I had --

20    that it was inflammation and some infection in my arm when I

21    last saw him before he referred me to UMMC.  University Medical

22    Center in Jackson.

10:06AM 23          **MS. BARNES:**  Have you been prescribed any antibiotics

24    or anything for this infection?

10:06AM 25          **PLAINTIFF BOYD:**  I have.

10:07AM   1          **MS. BARNES:**  And have you been taking them?

10:07AM   2          **PLAINTIFF BOYD:**  Whenever it flare up real bad,

3    Dr. Tony would give me something, but turn around there -- like

4    I said, he give it to me when he tell me the inflammation is

5    causing pressure on the nerve or whatever it is, and he gives

6    it to me when the inflammation flares up.  He examined me

7    himself.

10:07AM   8          **MS. BARNES:**  And which doctor?

10:07AM   9          **PLAINTIFF BOYD:**  Dr. Antonio Del Castillo.

10:07AM   10         **THE COURT:**  Dr. Castillo.

10:07AM   11         **MS. BARNES:**  Thank you.  You spoke a little about

12   physical therapy.  So have you received any physical therapy

13   since 2020, so after the injury occurred?

10:07AM   14         **PLAINTIFF BOYD:**  With the physical therapy, I was --

15   I was told that if I wouldn't continue with physical therapy, I

16   would receive a rule violation report.  And I was telling them

17   my arm is killing me.  That was when Dr. Glisson, James Glisson

18   was here.  I was, like, I'm not able to do physical therapy

19   with this arm because the other physical therapy had already --

20   the physical therapist Spencer had already injured my arm, and

21   then I continued -- Dr. Glisson told me that if I stopped, I

22   would turn around and get a rule violation, and I continued to

23   reinjure my arm all the way up until almost March 2023.  I had

24   to be -- I was forced to continue to do a physical therapy with

25   another physical therapist, Uri Diaz, and turning around there,

1    I was telling him the whole time, man, I'm reinjuring my arm

2    over and over when you do this.  He said, I know that.  They

3    making me have to do this physical therapy, and it was injuring

4    -- reinjuring my arm all the way up until I had to have

5    Dr. Speca to call MDOC and tell them don't keep having him to

6    do exercises with that right arm because you are going to cause

7    him to lose his arm.  He is just reinjuring it by turning

8    around there and you making him do physical therapy.

10:09AM  9         **MS. BARNES:**  To your knowledge, who set the

10   appointments for you to see Dr. Speca?

10:09AM  11        **PLAINTIFF BOYD:**  I would say the medical director had

12   to have something to do with it, or either it could have been

13   Dr. Castillo.  It could have been, you know, Dr. Scott.  Those

14   are the only three doctors I know of that would be able to set

15   an appointment like that.

10:10AM  16        **MS. BARNES:**  And about how many outside medical

17   providers have you seen since your injury?

10:10AM  18        **PLAINTIFF BOYD:**  I seen Dr. Speca and Dr. Terry.

19   And, you know, the doctor here at Mississippi State

20   Penitentiary, who is Castillo.

10:10AM  21        **MS. BARNES:**  Did Dr. Donovan ever treat you?

10:10AM  22        **PLAINTIFF BOYD:**  He didn't treat me, but he was the

23   acting medical director during the time that I was trying to

24   get the MRIs and the nerve conduction done.  And I was writing

25   him every week asking him to please grant me to get this nerve

1   conduction done so that I could turn around there and have the

2   surgery, that I was in excruciating pain.  I wrote him two

3   years straight every week.

10:11AM  4        **MS. BARNES:**  Did Dr. Donovan ever discuss the MRI

5   results or the nerve test results or the x-ray results with

6   you?

10:11AM  7        **PLAINTIFF BOYD:**  No, he didn't.  He just took and

8   wrote me a letter back one time out of the two years and said,

9   You can't make nobody do your surgery.  I wasn't -- I knew that

10   for a hundred percent that I couldn't make anyone do my

11   surgery.

10:11AM  12        **MS. BARNES:**  When was the last time you've seen an

13   orthopaedic specialist?

10:12AM  14        **PLAINTIFF BOYD:**  It's been over I would say -- let me

15   go back.  I hadn't seen an orthopaedic surgeon since I would

16   say early 2024, like maybe February or -- February or March of

17   2024.  And that was Dr. Terry.  And he wanted the nerve

18   conduction done.  He wanted an MRI that was new because he

19   wouldn't accept the 2023, March 2023 MRI because it was too

20   old.  He wanted one that was less than one year.

10:12AM  21      And even when I got the nerve conduction done the first of

22   2025, he wouldn't accept that MRI from 2024.  And Dr. Castillo

23   said that -- I asked him, I said, can you just -- I said, Well,

24   is they going to approve me to go back and take this MRI so I

25   can go back to Dr. Terry?  And he said, No, because I think we

1       are going to just have to find you another doctor.

10:13AM  2              **MS. BARNES:**  Just to make sure I'm understanding you

3       clearly, February to March of 2024 was the last time you saw an

4       orthopaedic specialist?  That's Dr. Terry, correct?

10:13AM  5              **PLAINTIFF BOYD:**  That's the last one I saw.

10:13AM  6              **MS. BARNES:**  Okay.  So since then, have you had an

7       MRI or nerve conduction test at all?

10:14AM  8              **PLAINTIFF BOYD:**  Since I saw Dr. Terry?

10:14AM  9              **MS. BARNES:**  Yes.

10:14AM 10              **PLAINTIFF BOYD:**  Well, a year later I had the nerve

11      conduction done, about -- it took -- I had the MRI done, and it

12      was done maybe two or three -- maybe four or five months after

13      I saw Dr. Terry, the MRI was done.  And that MRI I have, that

14      has on it the 6th of January -- of June -- June 6, 2024.

15      That's when the results was made.

10:14AM 16         And the nerve conduction was done almost a year later.

17      And from there, I just been dealing with deliberate

18      indifference from MDOC of not -- I don't even know where they

19      are at now because there's -- I don't have no appointments set

20      to have any surgery or anything like that, not to see an

21      orthopaedic surgeon.

10:15AM 22              **MS. BARNES:**  Have you had any outside medical

23      treatment, even aside from an orthopaedic specialist?  So this

24      could be a clinic, a medical center, just anything outside of

25      MSP?

10:15AM  1          **PLAINTIFF BOYD:**  Yeah, I have had -- I have been

2     outside of it.

10:15AM  3          **MS. BARNES:**  When was the last time?

10:15AM  4          **PLAINTIFF BOYD:**  I was rushed to Delta Regional

5     Center on January 28th with excruciating chest pain and was

6     admitted in the hospital in January.  A private ambulance had

7     to come into MDOC and get me.  Yeah, a private company

8     ambulance service had to come get me because they didn't have

9     transportation to take me out.

10:16AM  10         **MS. BARNES:**  Thank you, Mr. Boyd.

10:16AM  11         Can you describe for me -- and we are dealing with just

12    the issue with your shoulder.  Okay?  Can you describe how your

13    symptoms have changed, if at all, since the 2020 incident?

10:16AM  14         **PLAINTIFF BOYD:**  It has come to the point where it is

15    excruciating to move my shoulder any.  That's the only limb on

16    my body that I got that works.  I have continued to reinjure it

17    just trying to make it from one day to the next.  And like I

18    say, there's no alleviation in the pain medicine because I took

19    it so long until my body is immune to it, and it is causing me

20    agony, causing me excruciating pain 24/7.  You know, this is no

21    way for anybody to have to live dealing with something like

22    this.  If something happens to that right arm, I'm just like a

23    vegetable.  I can do nothing for myself completely.

10:17AM  24         **THE COURT:**  Let me ask you one question real quick.

25    So has the pain you are describing, Mr. Boyd, has the pain

1    worsened since 2020, or has it been consistently the same, as

2    you've testified just now?

10:17AM    3          **PLAINTIFF BOYD:**  It has critically worsened.

10:17AM    4          **THE COURT:**  Let me ask you about something different.

5    Since 2020, with your arm injury, has your strength in the arm

6    changed?

10:17AM    7          **PLAINTIFF BOYD:**  Yes, sir.

10:17AM    8          **THE COURT:**  How has your strength in the arm changed?

10:17AM    9          **PLAINTIFF BOYD:**  I can barely hold a pencil and write

10    with my hand now.  It's hard for me to even write with my hand

11    from the pain that I get from just trying to write or just

12    trying to pull myself from one side of the bed to the other

13    side of the bed, or even to turn around there and try to clean

14    myself off, you know, with that arm.  I can't hardly clean

15    myself with it.  It's got me where it has turned around there

16    and derailed my day-to-day life.

10:18AM    17          **THE COURT:**  So it sounds like when you say "write,"

18    you are talking about maybe grip strength.  Do you have

19    strength issues in any other part of your arm?

10:18AM    20          **PLAINTIFF BOYD:**  Well, I've got a pinched nerve in my

21    hand from the nerve conduction and, you know, the impinged

22    nerve in my right shoulder.  I cannot feel -- I have to look

23    with my eyes when I write because I have no sensation in my

24    hand or in my arm.

10:18AM    25          **THE COURT:**  Okay.  Ms. Barnes, you may resume.  Thank

1    you, ma'am.

10:18AM  2         **MS. BARNES:**  Mr. Boyd, are you alleging that

3    Dr. Donovan himself refused to set some appointments for you?

10:19AM  4         **PLAINTIFF BOYD:**  Well, I would say that he -- the

5    ball -- he turned around there and he was the medical director.

6    So everything -- when it comes to getting a nerve conduction

7    done or when it comes to getting an MRI done or something like

8    that, the medical director has to be the one to give the okay

9    on that.  I know that through Dr. Castillo.

10:19AM 10         **MS. BARNES:**  And what was Dr. Castillo's position at

11   that time when Dr. Donovan was the medical director?

10:19AM 12         **PLAINTIFF BOYD:**  He is the medical director of

13   Mississippi State Penitentiary at this present time.

10:19AM 14         **THE COURT:**  Hold on.  I didn't understand that

15   answer.  I think -- can you restate your question, Ms. Barnes,

16   and let him reanswer?

10:19AM 17         **MS. BARNES:**  Yes, Your Honor.

10:19AM 18       So at some point, Dr. Donovan was the medical director at

19   MSP, correct?

10:20AM 20         **PLAINTIFF BOYD:**  He was the acting medical director

21   during the time that I was -- that I seen Dr. Speca and

22   Dr. Terry.

10:20AM 23         **MS. BARNES:**  Was Dr. Castillo employed with MDOC at

24   that time?

10:20AM 25         **PLAINTIFF BOYD:**  He was.

10:20AM 1       **MS. BARNES:**  And what was his position?

10:20AM 2          **PLAINTIFF BOYD:**  The medical director here at

3    Mississippi State Penitentiary.  He's currently the medical

4    director here.

10:20AM 5          **MS. BARNES:**  So are you alleging that Dr. Castillo

6    worked under Dr. Donovan?

10:20AM 7          **PLAINTIFF BOYD:**  A hundred percent.

10:20AM 8          **MS. BARNES:**  Earlier you spoke about transportation.

9    In your earlier testimony, you said that you have missed some

10   appointments.  Are you stating that some appointments were set

11   and that the transportation issue is the reason why you

12   couldn't get there?

10:21AM 13         **PLAINTIFF BOYD:**  Exactly.  I turned around and been

14   having appointments from the last -- from 2024 to now, I've

15   been -- mostly every appointment, even if it's on-site, I have

16   missed the appointment.  I had an eye appointment and a dentist

17   appointment on last week, and I'm only four blocks from the

18   prison hospital, and they didn't have transportation to get me

19   there.

10:21AM 20         **MS. BARNES:**  Who gave you this information regarding

21   the transportation?

10:21AM 22         **PLAINTIFF BOYD:**  The transportation workers that are

23   there, they turned around and let me know.  I asked them, I

24   said, Why are y'all not coming to pick me up?  They said the

25   handicap van is tore up, or the handicap van is in use

1  somewhere else.  I was, like, you know, it's just deliberate

2  indifference.  It's not that they don't know that I have

3  appointments.  It's not that they are lazy.  They just -- from

4  what I've been told up to this present time, that they just

5  don't have transportation to take -- in this building, nearly

6  31 -- there's probably 30 or 40 people in wheelchairs and

7  needing a handicap van, but like I say, the two handicap vans

8  they have stay either tore up or in use somewhere else.  There

9  hasn't been a person leave out of this building -- I left out

10  in January, and I went -- only in January, they had to call --

11  like I say, they called an outside ambulance to come get me

12  because they didn't have transportation to take me to the

13  hospital.

10:22AM  14       **MS. BARNES:**  Regarding your missed appointments, were

15  any of the missed appointments for your MRIs and your x-rays?

10:23AM  16       **PLAINTIFF BOYD:**  Yes, ma'am, repeatedly.

10:23AM  17       **MS. BARNES:**  I have a question regarding surgery and

18  the approval of surgery.  So was there ever a time where you

19  were absolutely approved for surgery?

10:23AM  20       **PLAINTIFF BOYD:**  I don't understand what you are

21  saying when you say -- the MRI should be enough to prove that I

22  need surgery on my arm.

10:23AM  23       **MS. BARNES:**  So was there ever any information from a

24  medical provider where they said, we are going to do this

25  surgery?

10:23AM  1          **PLAINTIFF BOYD:**  I've had -- like I said, Dr. Terry,

      2   he took and told me, he said, Once you get the nerve conduction

      3   done, once you get me a new MRI, I will do the surgery.

10:24AM  4          **MS. BARNES:**  How many providers have told you that

      5   they would do your surgery?

10:24AM  6          **PLAINTIFF BOYD:**  Now, you said providers.  Are you

      7   talking about MDOC or outside doctors?

10:24AM  8          **MS. BARNES:**  Outside.

10:24AM  9          **PLAINTIFF BOYD:**  Dr. Terry.

10:24AM 10          **MS. BARNES:**  And where is he employed again?

10:24AM 11          **PLAINTIFF BOYD:**  Oxford, Mississippi.

10:24AM 12          **MS. BARNES:**  And Dr. Terry was the doctor who asked

     13   for the MRI, correct?

10:24AM 14          **PLAINTIFF BOYD:**  And the nerve conduction.

10:24AM 15          **MS. BARNES:**  And when was this?

10:25AM 16          **PLAINTIFF BOYD:**  Say that again, please.

10:25AM 17          **MS. BARNES:**  When was this?

10:25AM 18          **PLAINTIFF BOYD:**  This was 2024, the beginning of

     19   2024.

10:25AM 20          **MS. BARNES:**  So you've had the nerve tests, but

     21   you've not had the MRI.  Am I understanding that correctly?

10:25AM 22          **THE COURT:**  No, no, what he said earlier is, he saw

     23   Dr. Terry around February of 2024 -- and you correct this if I

     24   get it wrong, Mr. Boyd -- Mr. Boyd saw Terry around February of

     25   2024.  Terry said, Your MRI from 2023 is too old, I want a new

1   one, and I want a nerve conduction study because -- this is his

2   testimony -- because if your nerves are already shot, I'm not

3   going to go do surgery on you and possibly make you worse.  And

4   Mr. Boyd's testimony is, around late May of 2024, he had a

5   follow-up MRI.  The results he got, the radiologist read was

6   June 6th, 2024, was his testimony.  He didn't go get the nerve

7   conduction study until roughly February of 2025, and his

8   understanding right now from Dr. Castillo is that Dr. Terry

9   will require another MRI before he will see him again.  As I

10  understood his testimony, that's just what Dr. Castillo has

11  told him.  Is any of that incorrect?  I don't need you to

12  elaborate, but is any of that incorrect, Mr. Boyd?

10:26AM  13         **PLAINTIFF BOYD:**  That's a hundred percent.

10:26AM  14         **THE COURT:**  Okay.

10:26AM  15         **MS. BARNES:**  That's all I have, Your Honor.

10:26AM  16         **THE COURT:**  Okay.  Mr. Boyd, we have covered a lot,

17  and you just answered some questions from Ms. Barnes.  Is there

18  anything further you need to clarify, anything new?  I don't

19  need you to tell us anything again, but anything new you need

20  to clarify?

10:26AM  21         **PLAINTIFF BOYD:**  Well, you know, the only other thing

22  is, you know, my exhibit list and my witness list and that I

23  had done a -- I had sent in an amendment (unintelligible).

10:27AM  24         **THE COURT:**  Mr. Boyd, you had sent in an amendment,

25  and then we didn't understand the rest of what you said.

10:27AM  1     **PLAINTIFF BOYD:**  I said the amendment -- I was asking

2 to amend it just to show how my shoulder became injured.

10:27AM  3     **THE COURT:**  Okay.  So let's talk about the exhibit

4 and the witness list.  Obviously when you are here, it makes it

5 much easier because you can just hand those to me.  We are

6 going to have you submit those for filing through the prison

7 filing system.  Is there anything else in terms of

8 documentation that you've brought with you as required by my

9 order setting the omnibus hearing, any evidence or things like

10 that?

10:28AM  11     **PLAINTIFF BOYD:**  Well, yes, I have both MRIs, the one

12 that's from March of 2023, I have the one that's from -- that's

13 from June the 6th of 2024 -- the one for March 2023 and the one

14 from June 6th of 2024.  I have all of my medical records back

15 from 2020 of when my arm first got injured, my continued

16 complaints about it, where I was just receiving deliberate

17 indifference, that I was telling them I was in excruciating

18 pain.  I have my medical records all the way up until 2022.

10:29AM  19     **THE COURT:**  Okay.  Do you have your medical records

20 after 2022?

10:29AM  21     **PLAINTIFF BOYD:**  I don't -- well, I have the MRIs,

22 and Dr. Speca, what he have -- I have Dr. Speca's referral.  I

23 have UMMC's decline.  I have the -- all of my court papers

24 dealing with this situation.  And like I say, I got all of my

25 medical records all the way up to 2022.

10:29AM 1          **THE COURT:**  Okay.  You know, Alaine, I think probably

2      the best thing -- you can tell me your thoughts with Mr. Boyd.

3      Probably have him file his witness list and exhibit list, and

4      once we do the omnibus order, if there are things you want to

5      ask from his medical records at that point, if we open up

6      discovery, Ms. Barnes, you can request at that point.  Does

7      that make sense, Alaine, to you?

10:30AM 8          **LAW CLERK:**  It does.

10:30AM 9          **THE COURT:**  It's always a little cumbersome when you

10     are not here, Mr. Boyd, but it's just the nature of needing to

11     do this by Zoom.  What I'm going to direct you to do within 7

12     days from today's hearing is to file in the record a copy of,

13     number one, your exhibit list as detailed by the order setting

14     today's hearing, and number 2, your witness list, again, in

15     conformance with what I ordered you to do for today's hearing.

16     Do you understand that order?

10:30AM 17         **PLAINTIFF BOYD:**  Yes, sir, I do.

10:30AM 18         **THE COURT:**  Ms. Barnes, what have you brought on

19     behalf of the defendants as it relates to the documents, the

20     exhibit list and the witness list?

10:30AM 21         **MS. BARNES:**  Your Honor, I have our exhibit and

22     witness list here.  As far as the actual documents, we have

23     them prepared to mail to Mr. Boyd, but I do have my exhibit and

24     witness list with me today.

10:31AM 25         **THE COURT:**  Okay.  I will receive the exhibit and

1    witness list, and I will ask you, if you will, dictate into the

2    record what documents the defendants will be mailing to

3    Mr. Boyd.

10:31AM   4          **MS. BARNES:**  Yes, Your Honor.  First, we will have

5    plaintiff's ARPs, which are Bates-stamped MDOC-Boyd-496-1,

6    through MDOC-Boyd-496-148.  Next, we have plaintiff's

7    institutional records, which are Bates-stamped

8    MDOC-Boyd-496-149 through MDOC-Boyd-496-322.  Last, we have

9    plaintiff's medical records, which are Bates-stamped

10   MDOC-Boyd-496-323 through MDOC-Boyd-496-2906.

10:32AM   11         **THE COURT:**  Okay.  Thank you very much.  All right.

12   If you will, Ms. Barnes, go ahead and come up and bring your

13   witness and exhibit list to my law clerk, Ms. Obert.  If you

14   will, you can go ahead and execute this consent form.  And as I

15   mentioned earlier, that will be the copy we will mail to

16   Mr. Boyd.  Do you have a copy, Alaine, of the consent form?

17   Great.  Yes, let me take a look.

10:32AM   18        So, Mr. Boyd, once we file the exhibit list that we

19   receive from Ms. Barnes today -- in what you are mailing to

20   Mr. Boyd for the documents, Ms. Barnes, are you including with

21   it a copy of the witness and exhibit list you have just given

22   to the Court?

10:33AM   23         **MS. BARNES:**  Yes, Your Honor.

10:33AM   24         **THE COURT:**  Mr. Boyd, you are going to get a copy of

25   the witness and exhibit list that has been provided to the

Court today from Mr. Barnes in the packet she is going to send

with the documents she just described on the record.  Okay?

10:33AM          **PLAINTIFF BOYD:**  Yes, sir.

10:33AM          **THE COURT:**  Thank you, sir.

10:34AM     If you want to write MDOC and Dr. Donovan on two lines,

that is fine, because there are three lines.  So there will be

one for MDOC, one more Mr. Donovan, and then there will be a

line left for you, Mr. Boyd.  I'm talking about the consent

form right now.

10:34AM          **PLAINTIFF BOYD:**  Yes, sir.

10:34AM          **THE COURT:**  There wasn't a lot of space on the line

there.

10:34AM          **MS. BARNES:**  This will be much better.

10:34AM          **THE COURT:**  Thank you.  Yes.  Thanks.  Well, no, this

isn't right, Ms. Barnes.  Do you have another copy, Alaine?

You need to leave the bottom line blank for Mr. Boyd to sign.

10:35AM          **MS. BARNES:**  Okay.

10:35AM          **THE COURT:**  You will just sign the first two lines.

Line 1, fill it out for MDOC and yourself and your signature,

and line 2 for Dr. Donovan, and then leave that bottom one

blank.  So what Mr. Boyd will get, he will have one line there

left for him to write his name and sign his signature and put

the date if he consents.

10:36AM     All right.  Excellent.  Thank you very much.

10:36AM     So, Ms. Obert, I'm going to request that you mail a copy

1    of that to Mr. Boyd.  We will not file that on the docket.  We

2    are just going to mail a copy to you, Mr. Boyd.  You will need

3    to mail that back to the clerk's office if you sign it.

10:36AM    4            **PLAINTIFF BOYD:**  Yes, sir.

10:36AM    5            **THE COURT:**  Okay.  At this point, we are going to

6    wrap things up, so let me just give you some instructions as we

7    finish up today's hearing.

10:36AM    8        What I'm going to do next is review your statements that

9    you've given today as part of your testimony, your testimony,

10    your answers to my questions, your answers to Ms. Barnes'

11    questions, as well as your other filings to make a decision of

12    whether or not you have passed the screening phase of the

13    Prison Litigation Reform Act.  And we will advise you of my

14    decision through a written order.

10:36AM   15        If you do have a cause of action, I will enter a discovery

16    scheduling order at that time, and we will eventually set your

17    case for trial.  Until I do that, though, discovery is not

18    open.  Y'all cannot begin discovery until I give you permission

19    to do so.  So just be aware of that, that until you receive

20    information from me in an order following today's hearing

21    concerning the omnibus hearing, there will be no discovery that

22    can take place.

10:37AM   23        I do want to remind you that you have an ongoing

24    obligation to keep us updated on your current address.  Should

25    you be moved to a different facility for some reason for any

1   prolonged period of time -- and by prolonged, I mean more than

2   a week -- if you are in the hospital for a week, you don't have

3   to let us know you have changed your address, but if you have

4   moved some place where you are in a new living facility, you

5   need to promptly notify the court of your change of address.

6   Your failure to do so could result in your lawsuit being

7   dismissed for failure to comply with court orders.

10:38AM   8       Mr. Boyd, Ms. Barnes, I'm going to take this matter under

9   advisement.  As I mentioned, I will issue an order once I have

10   reached a decision.  Anything questions, Mr. Boyd?

10:38AM   11           **PLAINTIFF BOYD:**  No, sir.  Thank you for everything.

10:38AM   12           **THE COURT:**  Okay.  Thank you, Mr. Boyd.  Ms. Barnes,

13   any questions?

10:38AM   14           **MS. BARNES:**  No, Your Honor.

10:38AM   15           **THE COURT:**  That will conclude this matter, and the

16   Court will stand in recess.  Mr. Boyd, Ms. Barnes, y'all are

17   both dismissed.  Thank you very much for your attendance and

18   participation today.

10:38AM   19           **PLAINTIFF BOYD:**  Thank you for listening to me.

10:38AM   20                   (HEARING CONCLUDED)

21

22

23

24

25

CERTIFICATE OF COURT REPORTER

I, Teri B. Norton, RMR, FCRR, RDR, Official Court Reporter for the United States District Court for the Southern District of Mississippi, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

s/ *Teri B. Norton*
TERI B. NORTON, RMR, FCRR, RDR
OFFICIAL COURT REPORTER